```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
JAVIER VELAZQUEZ,
                    Plaintiff,            Case No. 16-CV-9606 (ALC) (SN)

        -against-                         **FIRST AMENDED COMPLAINT
                                          AND JURY DEMAND**

THE CITY OF NEW YORK, INSPECTOR
PETER VENICE, LIEUTENANT KEVIN
STAZINSKI, and LIEUTENANT DANIEL
BROWN,
                    Defendants.
-------------------------------------------------X
```

Plaintiff Javier Velazquez (hereinafter "Plaintiff,") as and for his complaint by his undersigned counsel, alleges as follows:

## INTRODUCTION

1. This is a suit to obtain relief for discrimination on the basis of Plaintiff's race and national origin, as well as retaliation arising from the discrimination which continues through his employment by the City of New York, (hereinafter "the City" through its agency, the New York City Police Department (hereinafter " the NYPD").

## VENUE

2. The basis of venue is Plaintiff's employment in New York County and New York County being the venue where the events alleged in the complaint occurred. Venue is proper in the United District Court for the Southern District of New York pursuant to 28 U.S.C. §§1391(b) and (c) and 42 U.S.C. 2000e-5(f)(3) in that the offices of defendants are within this district, a substantial part of the events giving rise to this claim arose in this district and records relevant to the practices complained of herein are located in this district.

## JURISDICTIONAL PREREQUISTE

3.  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and a right to sue letter was received by the plaintiff on September 14, 2016.

4.  This complaint is filed within 90 days of September 14, 2016.

## PARTIES

5.  Plaintiff Javier Velazquez is currently employed as a Police Officer in the NYPD currently posted to the 9th precinct located at 321 East 5th Street, New York, NY 10003.

6.  Plaintiff Velazquez is a Latin American Male originally from the Commonwealth of Puerto Rico and brings this action for racial discrimination, national origin discrimination, and retaliation.

7.  At all times relevant Plaintiff, as an employee of the NYPD, a department of the City, is by virtue of that fact, an "employee" of the CITY within the meaning of the relevant statutes.

8.  Upon information and belief, the CITY is a domestic government agency and is engaged in business in the state of New York, with a place of business in New York County.

9.  At all times relevant to this action, CITY was an "employer" for purposes of the common law of New York and the relevant statutes.

## FACTUAL ALLEGATIONS

10. From March 2014, until today, Javier Velazquez has been subjected to racial and national origin discrimination as a Latino and Puerto Rican, and racial discrimination by virtue of a hostile work environment, and has been subjected to continuous and continuing acts of retaliation because of his internal racial discrimination complaint and has been

discriminated against on the basis of his race and national origin.

11. In March 2014 plaintiff was transferred to the NYPD's 9th Precinct in Manhattan. When plaintiff arrived at the premises of the NYPD's 9th precinct to commence his assignment, he was not assigned a locker for a period of one month, although he requested a locker multiple times. The failure to assign a locker to the plaintiff was a deliberate effort to discomfit the plaintiff and show him that he was not welcome at the precinct, and was a sign of things to come.

12. On June 25, 2014, plaintiff was seriously injured in a motor vehicle accident, while off duty. Plaintiff injured his neck and was hospitalized for one month. While plaintiff was at the hospital, no officer from his command was assigned to visit him or check on his status although it was customary in the 9th precinct to assign an officer to visit any fellow officer hospitalized for that length of time. It is also customary to post signs within the precinct to inform officers whenever a fellow officer was hospitalized so that other officers who care to, may visit the hospitalized officer. This was not done in the case of the plaintiff.

13. In November 2014 when plaintiff returned from sick leave after approximately five months, plaintiff was assigned to the afternoon shift as a driver for Lieutenant Anglique Olaechea, working from 4:00 p.m. to midnight. This 4:00 p.m. to midnight shift suited the plaintiff as it enabled him to take care of his ten years old daughter in the daytime. On or about July 12, 2015, while plaintiff was on this assignment, plaintiff was approached by the Integrity Command Officer (ICO) Lieutenant Kevin Stazinski, a white male, who told the plaintiff that plaintiff was being re-assigned to the day tour as a punitive measure for being chronically sick. This punishment was unfair because plaintiff was not

chronically sick, and also because Lt. Stazinski was well aware that plaintiff is a single father of a ten years old daughter, and being on the mid-night shift afforded him time to care for his daughter in the daytime whereas being on the day shift was a hardship because plaintiff would not be able to care for his daughter in the daytime. Lt. Stazinski's treatment of plaintiff in that manner was racially motivated because white officers in plaintiff's position were not subjected to the same treatment and were routinely granted shifts favorable to them when they applied for it. On July 19, 2015, plaintiff was switched from the mid-night to the day tour as punishment.

14. White police officers who were routinely granted shifts favorable to them at their request and who were comparable to the plaintiff but were better treated include but are not limited to Police Officers Siminovic, McCutcheon, Pontebbi, Jurena, Burke, Incantalupo, and Brown.

15. On the same day, Lt. Stazinski went on to comment, in the presence of Lt. Olaechea and other officers, that plaintiff's disciplinary record with the NYPD shows that plaintiff is "a problem child". This public dressing down by Lt. Stazinski was un-necessary, uncalled for, and also un-true. It was also in violation of the Patrolman's Guide to Departmental Procedure which prohibits reprimanding a police officer in public. At this time, plaintiff had had no prior disciplinary problems with the NYPD and was not in a performance monitoring status. The verbal humiliation was also racially motivated as white officers such as Police Officers Siminovic, McCutcheon, Pontebbi, Jurena, Burke, Incantalupo and Brown, were never subjected to such treatment.

16. On or about October 14, 2015, plaintiff complained to the NYPD's Office of Equal Employment Opportunity (OEEO) about the racially discriminatory conduct of Lt.

Stazinski and other command officers regarding his punitive transfer to the day shift and also about being publicly dressed down by Lt. Stazinski. Plaintiff also complained to Lt. Olaechea, plaintiff's immediate supervisor, about the discrimination.

17. The OEEO took no action about plaintiff's complaint of racial discrimination, rather, plaintiff suffered immediate retaliation as a result. Immediately after plaintiff's complaint, within the same week, word came down from Commanding Officer (C.O.) Inspector Peter Venice (a white male) that plaintiff was absolutely prohibited from doing the 4:00 p.m. to midnight shift. Although now assigned to the day tour, plaintiff could still do the midnight shift by mutual agreement with another officer to switch assignments. This was a customary and routine practice in the 9th precinct and the NYPD as a whole, and also this practice is allowed by the Collective Bargaining Agreement between the police officers union and the NYPD. However, Inspector Venice ordered that under no circumstances should plaintiff be allowed to switch assignments if that meant that plaintiff could work the midnight shift. Plaintiff was informed by Sergeant William Moncada (male Hispanic), Sergeant Jamie Gifkins, and Lt. Olaechea, that as per Inspector Venice, plaintiff was absolutely prohibited from working the 4:00 p.m. to midnight tour under any circumstances. Inspector Venice personally called the desk sergeant and also called Lt. Olaechea to make sure they understood that plaintiff was banned from the 4 to 12 tour. Lt. Daniel Brown, the Scheduling Officer for the precinct, also confirmed the ban.

18. On or about December 3, 2015, plaintiff requested and had a meeting with Lt. Daniel Brown, the Scheduling Officer, about the hardship caused to plaintiff by the switch to the day tour as it made it difficult for plaintiff to care for his daughter. After plaintiff

explained his problem to Lt. Brown, the Lieutenant swore at the plaintiff and said "Get the fuck out of my face". Later that day, plaintiff was asked to report back to the 9th precinct where a PBA delegate told the plaintiff that plaintiff was scheduled for an internal NYPD Investigative Hearing (GO-15) because Lt. Brown alleged that plaintiff had threatened him. The GO-15 was allegedly scheduled to investigate plaintiff's misconduct in threatening Lt. Brown. This was a complete fabrication on the part of Lt. Brown. Plaintiff never threatened Lt. Brown. The allegation that plaintiff threatened Lt. Brown was false and calculated to punish the plaintiff for making a complaint of racial discrimination to the OEEO. The GO-15 initiated by Lt. Brown's false allegation did not initially result in a command discipline against the plaintiff and a command discipline was never adjudicated for it. Plaintiff was never informed of any command discipline at the time of the incident. However, on or about April 26, 2016, plaintiff was notified to appear at One Police Plaza on or about May 3, 2016 for adjudication of a command discipline regarding the fabricated charges, and plaintiff was asked to accept a penalty of being docked 30 vacation days and placed on probation for one year. Plaintiff refused to accept this penalty since plaintiff was innocent.

19. As a result of these bizarre events, plaintiff made another complaint to the NYPD's Office of Equal Employment Opportunity (OEEO) alleging that Lt. Brown's false allegations of misconduct against him was a pretext and was intended as retaliation for plaintiff's earlier internal complaint of racial discrimination. The OEEO took no action regarding this complaint.

20. On or about December 4, 2015, plaintiff received further retaliation and discrimination by being assigned to a patrol vehicle that was out of service.

21. On or about December 4, 2015, plaintiff received further retaliation by being put on a solo foot patrol in East Houston and FDR Drive, which is a well known punishment post within the command, not only because it is a dead end intersection that has no place for cover if anyone was trying to ambush the assigned police officer, but also because the assigned officer has no partner to watch their back.

22. After these events, in further retaliation, plaintiff received a performance evaluation rating of 2.5 for the ratings period from December 2014 to December 2015. This a low or sub-par evaluation. Such a low evaluation was unprecedented for the plaintiff. In plaintiff's previous 10 years of service with the NYPD, he had never received such a low annual rating. In the previous year, plaintiff scored a rating of 4.0. The low evaluation rating was unfair and did not reflect plaintiff's true performance. The low evaluation rating was imposed by plaintiff's superiors, the defendants, to punish him for complaining about racial discrimination. Plaintiff asked Sergeant Joseph Decandia, his immediate evaluator, why he received such a low rating and Sgt. Decandia stated, "I have nothing to do with this, it came from upstairs". Sergeant Decandia stated that the unfair low annual performance evaluation rating was ordered and imposed by the defendant Inspector Peter Venice, regardless of plaintiff's actual performance.

23. Under the complex performance evaluation system applicable to the plaintiff, police officers can receive one of nine available rating scores from 1 to 5 as follows, 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 4.5 and 5.0, with 1 as the lowest and 5 as the highest possible score. A score is further classified to fall into one of the following five categrories; Extremely Competent, (EC), Highly Competent (HC), Competent (C), Low (L), and Very Low (VL). A score of 4.5 and above is generally classified as extremely competent. A score of

4.0 is generally classified as highly competent. A score of 3.0 or 3.5 is a passing score and is generally classified as competent. Any score below 3.0 is a failing score. A score of 2.5 or 2.0 is a failing grade, generally classified as low, and is highly undesirable because it makes you a candidate for placement in the probationary performance monitoring program.

24. Annual performance ratings are important in that a rating of 4.0 or highly competent is generally required, in addition to passing the requisite civil service examination, for promotion to the next rank. Additionally, most specialized units within the NYPD generally require a rating of 4.5 (Extremely Competent) or 4.0 (Highly Competent) for incoming transferees. Transfers to specialized units within the NYPD are desirable because such units offer more opportunities for overtime pay and premium pay. Membership of such units also make it more likely that the police officer will be considered for promotions in rank and for supervisory and administrative positions within the same rank.

25. Annual performance ratings are also important because any rating below a 3.0 out of 5.0 is a negative performance evaluation that makes the recipient a candidate for placement into the probationary performance monitoring program.

26. Plaintiff was further punished by being told that he was prohibited from requesting a day off like other police officers in the command. The customary procedure for requesting a day off is to fill out a written request known as a Form 28, and submit it to your immediate supervisor, however, to punish the plaintiff, Inspector Venice has decreed that plaintiff cannot submit a leave request to his supervisor, rather, plaintiff must go directly to Inspector Venice in order to request a day off.

27. In further retaliation, or about February 27, 2016, plaintiff was unfairly denied line of duty designation although he suffered an injury on the job. Plaintiff suffered injuries to both shoulders on 2/27/16 after he and other officers responded to a call involving an emotionally disturbed person and in the process applied a takedown maneuver during which plaintiff and the emotionally disturbed person fell heavily to the sidewalk. Despite this fact, plaintiff's line of duty designation application was unfairly denied for an un-stated reason, although two other police officers, Heather Rodriguez and Ian Callen, witnessed the injurious incident and formally reported it to the command.

28. In further retaliation, Lt. Brown told Police Officer Justin Conde that he is not to accept any overtime applications from the plaintiff.

29. On or about April 14, 2016, plaintiff was informed that he had belatedly been issued command disciplines charging him with five counts of misconduct relating to alleged discourtesy to superior officers Sgt. Jamie Gifkins and Lt. Daniel Brown, which misconduct was alleged to have occurred on August 28 and December 3, 2015, respectively. This command disciplines are bogus and only brought in retaliation for plaintiff's complaints about racial discrimination.

30. Since plaintiff complained about racial discrimination, the defendants, especially, Lieutenant Diaz and Lt. Brown, have subjected the plaintiff to a hostile working environment, by ordering him back to the command (a 10-2 order) multiple times while he is on patrol, for trivial, bogus and/or pre-textual reasons, with the malicious intent of preventing the plaintiff from focusing on patrol and putting plaintiff's safety at risk.

31. Since plaintiff complained about racial discrimination, the defendants have subjected the plaintiff to a hostile working environment by unfairly placing the plaintiff in the 9th

precincts minor violations log book for various trivial, bogus and/or pre-textual reasons.

32. On May 3, 2016, plaintiff was assessed with a penalty of being docked 20 vacation days for allegedly threatening Lt. Brown, when in fact, plaintiff never threatened Lt. Brown.

33. On May 31, 2016, the plaintiff was unfairly placed into Level II –Disciplinary Monitoring Program, however, plaintiff was told that the placement took retroactive effect from March 3, 2016.

34. The performance monitoring program is a probationary program where police officers are placed for disciplinary purposes when they are deemed by the department to have engaged in a serious pattern of misconduct, or have ongoing severe disciplinary problems or when they have a negative performance evaluation rating.

35. Police officers placed on performance monitoring are denied certain benefits of their employment as follows, depending on the level of performance monitoring; they are not permitted to work paid detail (a source of premium pay or additional income); they are not permitted off duty employment; they are not permitted to work in the first platoon (the first platoon refers to the shift which starts from 11:15 p.m. and ends at 7:50 a.m., which pays a night differential in addition to the regular salary); they are not permitted to commence their tour later than 18:00 hours (this also means they can never get the night differential pay; they are not permitted to perform anti-crime duties (which eliminates any chance of a transfer to a specialized unit or any other favorable transfer). In addition, police officers on performance monitoring can be suspended, placed on modified duty assignment, or terminated at the discretion of the Police Commissioner.

36. There are three levels of performance monitoring, from the least serious to the most serious, as follows: Level I, Level II and Level III which includes all those on dismissal

probation. The criteria for being placed on Level I performance monitoring includes the following: Getting three or more CCRB complaints in a one year period; getting six or more CCRB complaints in the past five years; getting four or more excessive force complaints in the last two years or five or more excessive force complaints in the last four years; referral by competent authority such as the Integrity Control Officer or the Commanding Officer; being on suspension or modified duty; and being administratively transferred. The criteria for being placed on Level II performance monitoring include; being the subject of three or more commenced lawsuits for police action within a one year period or six or more commenced lawsuits for police action within a five year period; being the subject of one or more lawsuits for police action dispose for $100,000 or more within a one year period; being adjudged guilty of one set of departmental charges and specifications for excessive force action within five years, or of two or more substantiated civilian complaints within four years; serious misconduct resulting in a penalty of twenty days or more; or if performance or behavior remain sub-standard after one year of placement on Level I performance monitoring.

37. The criteria for being placed on Level III performance monitoring includes; being placed in performance monitoring at the direction of the Special Monitoring Committee, (made up of the First Deputy Commissioner, the Deputy Commissioners of Personnel, Internal Affairs and the Department Advocate), or on the recommendation of a Commanding Officer of a Precinct or Squad, or Borough Commander, and approval of that recommendation by the Special Monitoring Committee; and being placed on dismissal probation.

38. In practice, all it takes to have a police officer placed in the performance monitoring

program is the recommendation of the Commanding Officer (C.O.) or the Integrity Commanding Officer (ICO).

39. Defendants Venice and Stazinsky, the CO and ICO respectively of the 9th Precinct, set plaintiff up to be placed on performance monitoring by giving him an underserved annual performance evaluation rating of 2.5 which is a negative performance rating that makes plaintiff a candidate for performance monitoring.

40. In giving plaintiff a negative annual performance rating score, defendants Venice and Stazinski, both white males, were motivated by racial and national origin animus against plaintiff, a Latin American and Puerto Rican.

41. Defendants Venice and Stazinski gave plaintiff an unfair negative performance rating for the year 2015 because plaintiff is Puerto Rican and not white.

42. Comparably placed White Police Officers in the 9th Precinct in the year 2015, such as Police Officers Siminovic McCutcheon, Pontebbi, Jurena, Burke, Incantalupo and Brown, whose annual performance was similar or worse than that of Plaintiff Velazquez, received higher ratings of 3.0 and above while plaintiff received a negative rating of 2.5 for the same time period.

43. Defendants Venice and Stazinsky gave plaintiff an unfair negative performance rating for the year 2015 in order to retaliate against the plaintiff for making a complaint of racial discrimination against defendants Brown, Venice and Stazinski.

44. In placing plaintiff into Level II performance monitoring, defendants Venice and Stazinski were motivated by racial and national origin animus against plaintiff, a Latin American and Puerto Rican.

45. Defendants Venice and Stazinski unfairly placed plaintiff in Level II performance

12

monitoring because plaintiff is Puerto Rican and not white.

46. Comparably placed White Police Officers in the 9th Precinct in the year 2016, such as Police Officers Siminovic McCutcheon, Pontebbi, Jurena, Burke, Incantalupo and Brown, whose annual performance was similar or worse than that of plaintiff Velazquez were not placed in the performance monitoring program.

47. Defendants Venice and Stazinski placed plaintiff in the performance monitoring program in order to retaliate against plaintiff for making a complaint of racial discrimination against defendants Brown, Venice and Stazinski.

48. On or about March 18, 2016, in retaliation for his complaints of racial discrimination, plaintiff was unfairly issued with charges and specifications for alleged failure to make log entries.

49. On July 16, 2016, in further retaliation, plaintiff was unfairly placed in the minor violations log for being late for duty, when in fact plaintiff was not late for duty.

50. On August 8, 2016, in further retaliation, plaintiff was unfairly placed in the minor violations log for an un-authorized tour change, when in fact plaintiff was not guilty of an un-authorized tour change.

51. On September 8, 2016, in further retaliation, plaintiff was unfairly placed in the minor violations log for being late to roll call, when in fact plaintiff was not late to roll call.

52. On September 12, 2016, in further retaliation, plaintiff was unfairly placed in the minor violations log for failure to sign out, when in fact, plaintiff had not failed to sign out.

53. On September 15, 2016, plaintiff had car trouble on his way to work, and he called to notify his immediate supervisor, Sergeant Khazin, that he would be late as a result and Sergeant Khazin who understood and gave permission to the plaintiff to report late.

However, defendant Lt. Brown came looking for the plaintiff and was told by Sergeant Khazin that plaintiff was running late, whereupon Lt. Brown told Sergeant Khazin to put plaintiff in the minor violation log for being late. Sergeant Khazin declined this order. Lt. Brown then instructed Sergeant Dequevero to place plaintiff in the minor violations log for the same reason, and Sergeant Dequevero complied.

54. Typically, police officers who call in to request permission from the desk officer or other supervisor to be late and are given such permission are not then assessed with a violation as a result. The violation was imposed by Lt. Brown as retaliation to punish the plaintiff for his complaints of racial discrimination.

55. On September 15, 2016, plaintiff was initially assigned to a post within the command, then Sgt. Khazin changed plaintiff's post and sent him out to the field. Lt. Brown was looking for the plaintiff and Sgt. Khazin explained to Lt. Brown that he had changed plaintiff's post. Lt. Brown, then ordered Sgt. Khazin to charge plaintiff with a command discipline for an unauthorized post change. Sgt. Khazin declined this order because Sgt. Khazin had authorized plaintiff's post change. Lt. Brown then ordered Sgt. Khazin to instruct plaintiff to immediately return to the command and resume his previous post, and Sgt. Khazin complied.

56. On September 15, 2016, in further retaliation, plaintiff was unfairly placed in the minor violation log for being late for roll call when in fact plaintiff was not late for roll call.

57. On or about September 15, 2016, Captain Greany and Lt. Brown instructed all supervisors that plaintiff was not allowed to drive any of the supervisors.

58. On September 20, 2016, in further retaliation, plaintiff was unfairly placed in the minor violation log for being late for roll call when in fact plaintiff was not late for roll call.

59. On November 2, 2016, in further retaliation, plaintiff was issued an unfair and unwarranted command discipline for alleged failure to notify the command of off duty incidents.

60. On November 15, 2016, in further retaliation, plaintiff was issued an unfair and unwarranted charges and specifications for allegedly failing to request an emergency day.

61. In February 2017, Defendant Lt. Brown and Captain Greany, the current Commander of the 9th Precinct, further retaliated against the plaintiff by giving him an annual negative performance evaluation rating of 2.5 for the 2016 rating period.

62. In giving plaintiff a negative annual performance rating score, defendant Brown and Captain Greany, both white males, were motivated by racial and national origin animus against plaintiff, a Latin American and Puerto Rican.

63. Defendant Brown and Captain Greany gave plaintiff an unfair negative performance rating for the year 2016 because plaintiff is Puerto Rican and not white.

64. Comparably placed White Police Officers in the 9th Precinct in the year 2016, such as Police Officers Siminovic McCutcheon, Pontebbi, Jurena, Burke, Incantalupo and Brown, whose annual performance was similar or worse than that of Plaintiff Velazquez, received higher ratings of 3.0 and above while plaintiff received a negative rating of 2.5 for the same time period.

65. Defendant Brown and Captain Greany gave plaintiff an unfair negative performance rating for the year 2016 in order to retaliate against the plaintiff for making a complaint of racial discrimination against defendants Brown, Venice and Stazinski.

66. On or about March 27, 2017, in further retaliation, plaintiff was placed on modified assignment and the defendants withdrew his firearm and his shield.

67. On or about March 27, 2017, in further retaliation, plaintiff was punitively transferred from the 9th Precinct to the Quartermaster Section.

68. The hostile actions of the City and its employees have left Plaintiff emotionally scarred and have caused him to suffer great emotional pain. These actions have also severely undermined Plaintiff's confidence as a police officer.

69. Upon information and belief, Lt. Brown and Captain Greany have improperly used NYPD facilities to conduct personal investigations of the plaintiff using the license and registration information for plaintiff's personal vehicle.

70. The discriminatory actions of the Defendants are ongoing and continue to this day.

71. The facts which give rise to the within causes of action include but are in no way limited to the facts contained above.

## AS AND FOR A FIRST CAUSE OF ACTION

72. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

73. The Defendants discriminated against Plaintiff on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e) et seq.

## AS AND FOR A SECOND CAUSE OF ACTION

74. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

75. The Defendants discriminated against Plaintiff on the basis of his race in violation of New York State Executive Law (Human Rights Law) §296.

## AS AND FOR A THIRD CAUSE OF ACTION

76. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

77. The Defendants discriminated against Plaintiff on the basis of his race, in violation of

Administrative Code of the City of New York.

## AS AND FOR A FOURTH CAUSE OF ACTION

78. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

79. The Defendants retaliated against Plaintiff because he complained about the discriminatory treatment he was subjected to as a result of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e) et seq.

## AS AND FOR A FIFTH CAUSE OF ACTION

80. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

81. The Defendants retaliated against Plaintiff because he complained about the discriminatory treatment she was subjected to as a result of his national origin, in violation of New York State Executive Law.

## AS AND FOR A SIXTH CAUSE OF ACTION

82. Plaintiff adopts and incorporates each allegation set forth above in support of this count.

83. In light of the foregoing therefore, the Defendants retaliated against Plaintiff because he complained about the discriminatory treatment he was subjected to as a result of his national origin, in violation of the Administrative Code of the City of New York.

## AS AND FOR A SEVENTH CAUSE OF ACTION

84. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

85. The Defendants discriminated against Plaintiff on the basis of his national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e) et seq.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

86. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

87. The Defendants discriminated against Plaintiff on the basis of his national origin, in violation of New York State Executive Law (Human Rights Law) §296.

## AS AND FOR A NINTH CAUSE OF ACTION

88. Plaintiff repeats and re-alleges each allegation set forth above in support of this count.

89. The Defendants discriminated against Plaintiff on the basis of his national origin, in violation of Administrative Code of the City of New York.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff Javier Velazquez demands judgment as follows:

a. Against the Defendants, declaring the acts and practices complained of herein are in violation of the Title VII of the Civil Rights Act of 1964, Human Rights Law of the City of New York and the Laws of the State of New York;

b. Enjoining and permanently restraining these violations of the Human Rights Law of the City of New York and the Laws of the State of New York;

c. Directing Defendants to pay Plaintiff an additional amount as compensatory damages for his pain and suffering;

d. Directing Defendants to pay Plaintiff an additional amount as punitive damages for their willful and/or reckless disregard for Plaintiff's statutory rights;

e. Awarding Plaintiff such interest as is allowed by law;

f. Awarding Plaintiff reasonable attorney's fees and costs;

g. Trial by Jury; and

h. Granting such and further relief as this Court deems necessary and proper.

Awarding Plaintiff, Javier Velazquez, such damages as may be proved at trial, including

reinstatement, back pay, front pay, compensatory damages, and punitive damages as well as costs and disbursements of this action.

Dated:    New York, New York    Respectfully submitted,
April 26, 2017

                                                    /s/
Chukwuemeka Nwokoro (CN-1038)
Nwokoro & Scola, Esquires
Attorney for Plaintiff Javier Velazquez
44 Wall Street, Suite 1218
New York, NY 10005
(212) 785-1060
Emekanwokoro101@yahoo.com